# In the United States Court of Federal Claims

No. 22-887C

(Filed Under Seal:  November 10, 2022)

(Reissued for Publication:  November 21, 2022)

|  |  |
|---|---|
| **VANQUISH WORLDWIDE, LLC,** | ) |
| *Plaintiff,* | ) |
| v. | ) |
| **THE UNITED STATES,** | ) |
| *Defendant,* | ) |
| **and** | ) |
| **AMENTUM SERVICES, INC.,** | ) |
| *Defendant-Intervenor.* | ) |

*Michael D. Maloney*, Williams Mullen, Tysons, VA, for Plaintiff.  Of counsel was *Todd W. Miller*, Miller & Miller, Golden, CO.

*Andrew Hunter*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel was *Captain Natalie W. McKiernan*, Contract Litigation & Intellectual Property Division, United States Army Legal Services Agency, Fort Belvoir, VA.

*Kevin P. Connelly*, Vedder Price P.C., Washington, D.C., for Defendant-Intervenor.  Of counsel were *Kelly E. Buroker*, *Tamara Droubi*, and *Jeffrey M. Lowry*.

<u>**OPINION AND ORDER**</u><sup>*</sup>

*SOLOMSON*, **Judge.**

This is a story not of a party sleeping on its rights but relinquishing them and then seeking a mulligan.

In a previous action before this Court, Defendant-Intervenor, Amentum Services, Inc. ("Amentum"), challenged the award of a contract by Defendant, the United States — acting by and through the U.S. Department of the Army (the "Army") — to Plaintiff, Vanquish Worldwide, LLC ("Vanquish"). In response to Amentum's complaint, the government proposed corrective action to moot the dispute. All the parties — and this Court — agreed to the government's approach, including the dismissal for mootness. Vanquish has since found the Army's corrective action wanting and thus asks this Court to order the Army to stop or modify its ongoing corrective action process.

As explained below, the fatal sand trap for Vanquish here is that it agreed to the Army's selected course of action and cannot now restart at the first hole.

I.      **FACTUAL BACKGROUND**[1]

A.  **The Procurement**

1.  **The Solicitation**

This case concerns the Enhanced Army Global Logistics Enterprise ("EAGLE") program. AR 1. The objective of the EAGLE program "is to provide global logistics services, primarily [m]aterial [m]aintenance [s]ervices, [r]etail/[w]holesale [s]upply [s]ervices, and [t]ransportation [s]upport [s]ervices, that meet the Army's logistics mission needs in the most efficient and cost-effective manner." AR 4.

---

<sup>*</sup> Pursuant to the protective order in this case, the Court initially filed this opinion under seal on November 10, 2022, and directed the parties to propose redactions of confidential or proprietary information by November 17, 2022. The parties have jointly submitted proposed redactions to the Court. ECF No. 37. The Court adopts those redactions, as reflected in this public version of the opinion. Words or phrases that are redacted have been replaced with [ * * * ].

[1] This background section constitutes the Court's findings of fact drawn from the administrative record. Rule 52.1 of the Rules of the United States Court of Federal Claims, covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005). Citations to the administrative record, *see* ECF Nos. 21, 24, are denoted as "AR" followed by the page number. Additional findings of fact are made throughout Section V.

EAGLE is implemented through "a multi-step acquisition process," via which the Army periodically awards basic ordering agreements ("BOAs"). AR 4.[2] The Army then issues competitive task order "requests for specific requirements that will result in one requirements task order per [Army] installation." AR 4. The initial estimated value for the EAGLE program was $23.8 billion. AR 25; AR 30.[3] On September 1, 2016, the Army approved an "extension to the EAGLE acquisition strategy for a period of ten (10) years beyond the . . . expiration date of 27 September 2017." AR 65.

On October 28, 2019, the Army finalized a Source Selection Plan ("SSP") for "a requirement for contract services to support logistics support services at Fort Polk, LA covering a five year period from [an] anticipated start date of May 2020 through May 2025." AR 81. The anticipated contract (the "Task Order") would cover "activities [that] directly and indirectly support training of forces, preparing forces for deployment, sustainment, redeployment in support of current conflicts, reset forces, and to rebuild readiness for future deployments and contingencies to meet the demands of a persistent conflict in the 21st Century." AR 83. The Army estimated the total value of the procurement at approximately [ * * * ]. AR 83. The SSP indicated that the Task Order "will be solicited on a competitive basis through a full and open competition to all [EAGLE BOA] holders utilizing a competitive best value source selection process," in accordance with FAR 15.101-1. AR 83.

On April 6, 2020, *see* AR 11150, the Army issued the request for proposals for the Task Order, Solicitation No. W52P1J-19-R-0081 (the "Solicitation" or "RFP"). AR 95–345.[4] The Solicitation informed potential offerors that the Army intends to award a cost-plus-fixed fee task order with a performance period of a one-year base period (including a sixty-day transition-in period), four one-year option periods, and one six-month option period in accordance with Federal Acquisition Regulation ("FAR") 52.217-8. AR 96 (RFP § A.3). Amentum's predecessor is the incumbent contractor for the services sought in the RFP. AR 96 (RFP § A.7); AR 1949 (Amentum Proposal). Proposals were due June 25, 2020. AR 1245 (RFP Amendment 0006).

---

[2] *See* AR 31 (explaining that, "[p]ursuant to Federal Acquisition Regulation 16.702(a)(2) BOAs are not contracts," and "therefore, the contractual obligation occurs at task order execution"); AR 70 (Pre-Solicitation Notice) (delineating "the annual synopsis for requirements falling under the scope of the [EAGLE] program" for which additional BOAs would be awarded).

[3] As of May 9, 2016, only approximately $1.7 billion of the projected $23.8 billion had been awarded. AR 66.

[4] The Army issued seven (7) amendments to the RFP between May 1, 2020, and June 23, 2020. *See* AR 346–597 (RFP Amendment 0001) (issued May 1, 2020); AR 597–645 (RFP Amendment 0002) (issued May 20, 2020); AR 646–47 (RFP Amendment 0003) (issued May 27, 2020); AR 648–1241 (RFP Amendment 0004) (issued June 4, 2020); AR 1242–43 (RFP Amendment 0005) (issued June 10, 2020); AR 1244–45 (RFP Amendment 0006) (issued June 22, 2020); AR 1246–1248 (RFP Amendment 0007) (issued June 23, 2020).

Section L of the RFP, as always, provided instructions for proposal preparation, with several instructions designated as "COMPLIANCE REQUIREMENT[S]."  *See, e.g.*, AR 154 (RFP § L.4.1.2(b)) ("COMPLIANCE REQUIREMENT: Failure to provide the most current versions of the RFP Attachments 0002, 0003, or 0005 shall render the Offeror[']s proposal non-compliant and [it] will not be further considered for award." (emphasis omitted)); AR 155 (RFP § L.5.1.1(d)) ("COMPLIANCE REQUIREMENT: Failure to provide the signed SF 33 will render the Offeror's proposal non-compliant.  The proposal will not be evaluated and will not be further considered for award." (emphasis omitted)).[5]

The RFP further warned offerors:

> *Failure to provide proposals in compliance with the instructions specified as COMPLIANCE REQUIREMENTS in Section L of this RFP and in compliance with ALL instructions in Section M.3 of this RFP shall render the Offeror's proposal non-compliant.  The proposal will not be evaluated and will not be further considered for award.*

AR 153 (RFP § L.2.1).[6]

With regard to the possibility of discussions,[7] Section L cautioned offerors as follows:

> [T]he Government intends to award a task order without discussions.  Offerors are cautioned to examine this RFP in its entirety and to ensure that proposals contain all necessary information, provide all required documentation, and are complete in all respects.  The Government is not obligated to make another request for the required information nor does

---

[5] The Court counts at least fifteen (15) additional proposal instructions in Section L similarly designated as a "COMPLIANCE REQUIREMENT."  AR 154, 156–57, 159–61, 164–70; *see also* AR 173 (RFP § M.3.2.1) ("The Government will compare the Offeror's proposal to Section L in order to perform a compliance review.  Any Offeror's proposal determined non-compliant per the terms noted in Section L or determined non-compliant per paragraphs M.3.2.1.1 through M.3.2.1.2(c) below[] will not be evaluated and will not be further considered for award.").

[6] The substance of this warning was repeated in Section L.4.1.2.  AR 154 (RFP § L.4.1.2) ("To be considered for this requirement, the Offeror must submit a complete response to this RFP using the instructions provided in Section L.  *COMPLIANCE REQUIREMENT: If the Offeror's proposal fails to meet the terms and conditions of the RFP or takes exception to any of the terms and conditions of the RFP, will render the Offeror's proposal unacceptable and will not be further considered for award.*").

[7] *See* FAR 15.306 ("Exchanges with offerors after receipt of proposals"); FAR 15.307 ("Proposal revisions").

> the Government assume the duty to search for data to cure
> problems it finds in proposals. *The Government reserves the*
> *right to conduct discussions in the evaluation process and to permit*
> *Offerors to revise proposals, if deemed necessary.*

AR 152 (RFP § L.1.2) (emphasis added). The RFP further provided that "the Contracting
Officer may limit the number of proposals in the competitive range," and that "[a]ny
Offeror eliminated from further consideration will be notified in writing." AR 153 (RFP
§ L.1.2).

    The RFP in Section L did not expressly explain whether the government's
reservation of rights to conduct discussions "to cure problems it finds in proposals" and
"to permit Offerors to revise proposals, if deemed necessary," AR 152 (RFP § L.1.2), might
apply to an initial proposal that failed a compliance requirement. On the other hand,
despite the warnings cautioning offerors that a proposal that fails a specifically-
designated compliance requirement "will not be evaluated" or be "further considered for
award," AR 153 (RFP § L.2.1), the RFP "reserve[d] the [Army's] right to . . . waive the
strict compliance review" and to "conduct discussions," AR 172 (RFP § M.2); *see also* AR
172 (RFP § M.3) ("The Government reserves the right to waive the Strict Compliance
Review if it is in the Government['s] best interest.").

    Section M of the RFP provided that the Army's evaluation would proceed in
stages, in accordance with the Army's strict compliance review, "starting with the lowest
total proposed priced offer" and progressing "to the highest total proposed priced offer,
until at least five (5) or 20% of the proposals (whichever is greater) are determined to be
compliant." AR 172 (RFP § M.3.2). The RFP advised offerors "that initially only the pool
of five (5) or 20% (whichever is greater) of the proposals found to be compliant will move"
on in the process for further evaluation. AR 172; *see also* AR 173 (RFP § M.3.2.2) ("Only
Offerors whose proposals are determined to be compliant will move to Step 1 of the
evaluation process.").

    Section M.4 of the RFP delineated the Army's evaluation methodology. AR 173.
It provided for "a competitive best value source selection in which competing Offerors
will be evaluated against four evaluation factors: Technical, Past Performance, Cost/
Price, and Small Business Participation." AR 173 (RFP § M.4.1). The Army had to
"evaluate the Technical Factor on an Acceptable/Unacceptable basis." AR 173. The RFP
further required the Army to perform a "qualitative assessment" of past performance "by
assigning confidence ratings." AR 173. Although "Cost/Price will be an evaluated
factor[,] . . . it will not be rated." AR 173. Finally, the RFP provided that "[t]he
Government will evaluate the Small Business Participation Factor on an Acceptable/
Unacceptable basis." AR 173. In terms of relative weights and the ultimate best value
decision, "[t]he Past Performance Factor is significantly more important than the
Cost/Price Factor and Small Business Participation Factor" and "[a]ll non-cost factors,

when combined, are significantly more important than the Cost/Price Factor." AR 173. Contradicting general best value trade-off principles, however, the RFP provided that "[a]ward will be made to the responsible Offeror with the lowest evaluated (fair and reasonable) priced proposal that is determined Technically Acceptable with Substantial Confidence in Past Performance and an Acceptable rating in Small Business Participation." AR 173.

For the proposals that made it past the strict compliance review, if performed, the RFP provided for a three-step evaluation process. In "Step 1," the Army would evaluate offerors' technical proposals "on an Acceptable/Unacceptable basis" in accordance with the evaluation criteria set forth in Section M.5. AR 173 (RFP § M.4.1). As part of Step 1, "the Government reserve[d] the right to conduct discussions [in accordance with Section] M.4.4 . . . if the Contracting Officer determines that discussions would be advantageous [to] the Government." AR 173. Following the technical evaluation, "only the three (3) lowest proposed priced compliant offerors determined technically acceptable will move to Step 2." AR 173.

With respect to "Step 2," the RFP provided that the Army would conduct evaluations of the past performance, cost/price, and small business participation factors. AR 173 (RFP § M.4.1). As noted above, only the three "compliant proposals" with the total lowest price "that are determined Technically Acceptable at Step 1 will be evaluated" in Step 2 per "the [evaluation] criteria detailed in Section M.5." AR 173. At the end of Step 2, "[a]ll proposals which are determined to have Substantial Confidence in Past Performance, an Acceptable rating in Small Business Participation, with a realistic cost, will move to Step 3." AR 174 (RFP § M.4.1.d).

"Step 3" involved the Army's making a task order to the "responsible" offeror whose proposal: (1) "complies with the RFP requirements" and is technically acceptable; (2) offers a "fair and reasonable" price and "is determined to be the lowest total evaluated priced proposal"; (3) receives a "Substantial Confidence" rating for the past performance factor; and (4) is assigned an "Acceptable" rating for the small business participation factor. AR 174 (RFP § M.4.1).

Nothing in Sections M.5 or M.4.4 clearly precluded discussions for offerors found to be technically unacceptable following the evaluation of initial proposals. Indeed, the RFP appears to contemplate the possibility of discussions within both Step 1 and Step 2:

> M.4.4-Discussions
>
> M.4.4.1-The Government intends to award without discussions with respective Offerors. IF AND ONLY IF discussions are conducted, upon completion of the Technical Factor evaluations, the Government will make *a subsequent competitive range determination*, [in accordance with] FAR

15.306, based on the *final ratings* of each [t]echnical proposal against the Technical Factor evaluation criteria.    Only Offerors determined Technically Acceptable will remain in *this subsequent competitive range* and proceed to the Past Performance, Cost/Price, and Small Business Participation evaluations identified in STEP 2 above.

M.4.4.2-IF AND ONLY IF discussions are conducted in Step 2, upon completion of the Past Performance Factor and Cost/Price Factor evaluations, the Government will make a competitive range determination, [in accordance with] FAR 15.306.  The Past Performance Factor will be evaluated using a qualitative assessment by assigning confidence ratings.  The Cost/Price Factor will be evaluated for price reasonableness and cost realism, but it will not be assigned an adjectival rating.    Only highly rated proposals or proposals not requiring a major rewrite will remain in the competitive range.  Discussions will be held with all Offerors remaining in the competitive range.

AR 174 (emphasis added).

Notably, the RFP expressly reserved the Army's right *not* to follow the three-step process at all: "The Government reserves the right to simultaneously evaluate Technical, Past Performance (if applicable), Small Business Participation (if applicable), and Cost/Price proposals."  AR 174 (RFP § M.4.1.f).

## 2.  Proposals, Evaluations, and Contract Award

The Army received nine proposals.  AR 11050.  Following the resolution of two pre-award bid protests,[8] the Army assessed the proposals and found them all "compliant with the instructions provided in Sections L and M of the RFP" such that they "move[d] to Step 1 of the evaluation process."    AR 10629 (Proposal Compliance Standings Memorandum).  The compliant proposals included Vanquish Worldwide, LLC, as well as Amentum Services, Inc., and Vectrus Mission Solutions Corp. ("Vectrus").  AR 10629. On December 9, 2020, the Army requested that all offerors "extend and validate proposals through March 25, 2021."  AR 11060 (Source Selection Evaluation Board Report).  Vectrus, however, failed to do so and thus "was removed from the competitive range voluntarily for not responding by the due date."  AR 11060.  The Army, however, "decided to add

---

[8] Two GAO pre-award protests were filed prior to the final due date.  *See* AR 11060 (Source Selection Evaluation Board Report).  In response to the first protest, the Army took corrective action by amending the RFP.  AR 11060.  The GAO denied the other protest.  *See* AR 11060.

Vectrus back into the competitive range as it was not expecting to be voluntarily removed" and for other reasons.  AR 11060.[9]

Following Step 1, Amentum received an overall technical evaluation factor rating of "Unacceptable" based on Amentum's proposed "Staffing/Labor Mix."  AR 10630 (Amentum Technical Consensus Worksheets); AR 10840 (Amentum Technical Evaluation – Final Report); AR 11063 (Source Selection Evaluation Board Report).  That overall technical rating was the result of an unacceptable rating for Amentum's "Staffing/Labor Mix."  *See* AR 10840, 10845–49.  In contrast, Vanquish received an overall technical factor rating of "Acceptable."  AR 10890 (Vanquish Technical Evaluation – Final Report); AR 11063.  Amentum, however, was the lowest total proposed priced offeror at $253,830,413, while Vanquish was the second lowest at $258,798,380.  AR 11051; AR 11061–62.

On June 2, 2021, the Source Selection Authority issued her Source Selection Decision Document ("SSDD"),[10] AR 11049–55, selecting Vanquish as the "best overall value in accordance with the [RFP's] criteria . . . to satisfy the U.S. Government's requirement for Logistics Support Services at Fort Polk, LA," AR 11055.  Despite the Source Selection Evaluation Board's reference to a competitive range which variously included or excluded Vectrus, *see* AR 11060, the SSDD makes no mention of any decision to form a competitive range or whether the Army even considered conducting discussions.  The Army notified Vanquish of its award of the Task Order on June 8, 2021.  AR 11080 (Notice of Contract Award).  On that same date, the Army notified Amentum that it was unsuccessful and provided a written debriefing.  AR 11148–50 (Unsuccessful Offeror Notice /Debriefing – Amentum).

### B.  Amentum's Bid Protest

Three disappointed offerors, including Amentum, filed post-award GAO protests, all of which were denied or dismissed by September 30, 2021.  *See* AR 20489–501 (GAO Protest Decision – Amentum & VS2, LLC); AR 20506–08 (GAO Protest Decision – Data Solutions & Technology, Inc.); *see also Amentum Servs., Inc.*, B-418742.3, 2021 CPD ¶ 334, 2021 WL 4819074 (Comp. Gen. Sept. 30, 2021).

On October 15, 2021, Amentum filed a complaint in this Court against the United States, pursuant to 28 U.S.C. § 1491(b)(1), challenging the Army's contract award to

---

[9] The Court could not locate documentary evidence of this competitive range determination in the administrative record.

[10] The SSDD has two different dates on it — June 2, 2022, appears to be the correct one.  AR 11055. In addition, the Index to the Administrative Record, ECF No. 21-1, incorrectly lists the SSDD as contained at Tab 39, AR 11060.  That citation, however, is to the first page of the Source Selection Evaluation Board Report (and not the SSDD).

Vanquish. Complaint, *Amentum Servs., Inc. v. United States*, 2021 WL 5871734 (Fed. Cl. 2021) (No. 21-2029C), ECF No. 1. On October 18, 2021, Vanquish intervened in the case. Motion to Intervene, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 16. On November 4, 2021, Amentum filed an amended complaint, asserting, *inter alia*, that: (1) the "Army unreasonably deviated from the stated proposal instructions and evaluation criteria set forth in the [S]olicitation by rejecting Amentum's proposal as technically unacceptable"; and (2) the Army should have conducted discussions, pursuant to DFARS 215.306(c)(1), but failed to do so. Amended Complaint ¶¶ 131, 142, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 21. Amentum sought a declaration "that the Army violated the requirements of DFARS 215.306(c)(1) by failing to conduct discussions" and a "permanent injunction, requiring the Army to cancel its improper award to Vanquish." *Id.* at 32.

In response to Amentum's amended complaint, the government, on December 3, 2021, filed an unopposed motion to stay the proceedings in that case and for a voluntary remand to the Army, pursuant to Rule 52.2 of the Rules of the United States Court of Federal Claims ("RCFC"). Motion to Remand, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 26. In that motion, the government represented that the Army "wishes to reconsider its award decision in light of the issues raised by Amentum's complaint." *Id.* at 3. The government therefore requested, *inter alia*, that the Court "remand this matter to [the Army] for reconsideration of the challenged decision and any further administrative actions consistent with that reconsideration." *Id.* Additionally, the government asked the Court to "authorize . . . [the Army] to consider any further information that the agency may gather during the remand in accordance with any procedures that the agency may establish for that purpose." *Id.* The government argued that "[a] remand is in the interest of justice because it will provide the agency with an opportunity to reconsider the award decision at issue in light of Amentum's allegations and any new information gathered during the proposed remand." *Id.* at 2. Moreover, the government asserted that "[d]uring the proposed remand, the agency potentially could make a decision that could moot this action, in whole or in part, and may obviate the need for further litigation in this Court." *Id.* Finally, the government maintained that its request was made "in good faith" and that "[w]hen, as in this case, 'the agency's concern is substantial and legitimate, a remand is usually appropriate.'" *Id.* (quoting *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001)). The government's motion admitted no error and "[did] not commit to any particular course of corrective action." *Amentum Servs., Inc.*, 2021 WL 5871734, at *1.

During a subsequent December 7, 2021, status conference to discuss the government's motion, "the government disclosed the existence of an internal memorandum that addresses whether the agency planned to conduct discussions in the procurement at issue." *Amentum Servs., Inc.*, 2021 WL 5871734, at *1. Based on that memorandum, the government was "disinclined to defend the agency's decision not to conduct discussions." *Id.* But, "[b]ecause the remedy for a violation of DFARS 215.306,

in any event, would likely [have been] an injunction requiring the agency to consider in the first instance, under the proper standard, whether discussions should be conducted," the government urged this Court to "permit a remand . . . for that very purpose." *Id.* The government proposed that, on remand, "the agency will decide either (a) to conduct discussions (and accept final proposal revisions), thus rendering the . . . dispute moot, *or* (b) discussions are not warranted, but will memorialize its new decision for possible judicial review, should Amentum seek to amend its complaint further to challenge such a newly rendered decision." *Id.*

Applying *Keltner v. United States*, 148 Fed. Cl. 552 (2020), and *SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001), this Court denied, in part, the government's motion for a voluntary remand. *Amentum Servs., Inc.*, 2021 WL 5871734, at *2–3. In particular, this Court explained:

> [S]uch a remand — at least as proposed — would likely "delay this case . . . and serve to only potentially improve the government's litigation posture." The government's mere assertion that the agency desires another opportunity to review its decision is insufficient to justify granting the broad discretion the government seeks via its voluntary remand motion. In that regard, while the need for finality at this juncture perhaps is not overwhelming, the Court sees no reason to order a remand and have this case remain on the Court's docket [pursuant to RCFC 52.2] while the agency broadly reassesses its position, all while having an unrestricted opportunity to effectively supplement the administrative record — something the government could not so easily accomplish during the litigation of this case.

*Id.* at *2 (second alteration in original) (quoting *Keltner*, 148 Fed. Cl. at 565).

The Court further found "that the scope of the government's remand request [was] inappropriate" in light of the government's having "propose[d] broad discretion in its remand request, including the right to take '*any* further administrative actions' . . . and the right to 'consider *any further information that the agency may gather* during the remand in accordance with *any procedures that the agency may establish* for that purpose.'" *Amentum Servs., Inc.*, 2021 WL 5871734, at *2 (quoting Motion to Remand at 3, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 26). The Court concluded that "[s]uch latitude is neither appropriate nor just given the narrow issue the agency putatively seeks to address — whether the agency should have conducted discussions in the first instance." *Id.*

In sum, this Court concluded that "the agency either stands by its award decision or it does not, and the procurement decision at issue is either ripe for review or it is not" but there was "no reason in this case [for the Court] to superintend a remand process by adopting the government's proposed voluntary remand order." *Amentum Servs., Inc.*, 2021 WL 5871734, at *3. While the Court denied, in part, the government's motion, and "decline[d] to exercise its discretion to order a remand," the Court imposed a "brief stay of th[e] case for the government to reconsider its contract award decision — *i.e.*, to determine whether discussions [were] warranted . . . (pursuant to DFARS 215.306)." *Id.* This Court noted that such an order represented "a fitting compromise, one to which ***no party raised a substantial objection*** during the December 7, 2021, status conference, when the Court proposed it." *Id.* (emphasis added). The Court further ordered the parties to file a joint status report ("JSR"), on or before the conclusion of the stay, indicating whether:

1. The government has decided to rescind the disputed contract award for the purpose of engaging in discussions (and accepting final proposal revisions), *thereby rendering th[e] case moot*;

2. The government has decided not to rescind the . . . contract award, in which case the parties shall propose a schedule for further proceedings; *or*

3. The government proposes to rescind the disputed award decision for yet other reasons, in which case the parties shall provide their respective positions as to how the case should proceed, if at all.

*Amentum Servs., Inc.*, 2021 WL 5871734, at *3 (first emphasis added) (footnotes omitted).

On January 24, 2022, the parties filed a JSR, selecting the Court's first option. Joint Status Report, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 30. The parties, including Vanquish, jointly represented as follows:

The [Army] has decided to rescind the disputed contract award to Vanquish, establish a competitive range, engage in discussions, and accept proposal revisions. The agency's decision renders Amentum's protest moot. The parties intend to file a joint stipulation of dismissal without prejudice with each party to bear its own costs and fees.

*Id.* at 1. On January 28, 2022, the parties filed a joint stipulation of dismissal without prejudice, Joint Stipulation of Dismissal, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 31, and the Court, accordingly, dismissed the case that same day.

11

### C. The Army's Post-Remand Discussions Process

Following the dismissal of Amentum's protest, the government implemented the corrective action by establishing a competitive range.  AR 20530 (Competitive Range Determination – Final).  The Army decided, "[a]fter evaluating the original compliance review performed on each proposal," that seven (7) offerors "will be within the competitive range during discussions."   AR 20532–33 (noting that "[t]he Strict Compliance memorandum for the record, dated 10 August 2020, provides details of the original compliance review").  The Army included both Amentum and Vanquish in the competitive range.  AR 20533.

On April 27, 2022, the Army transmitted letters to offerors regarding discussions. AR 20667–78.  The letter to Vanquish, for example, advised that "[t]he Government evaluated your proposal dated 22 June 2020 and you are hereby afforded the opportunity to update your proposal."  AR 20675.  Because Vanquish "was previously determined to be Technically Acceptable," Vanquish did not receive any evaluation notices ("ENs") critiquing its proposal for weaknesses or deficiencies.  AR 20675.  Amentum, however, was instructed to review and address ENs — to "correct deficiencies" — in a revised proposal.  AR 20667; *see also* AR 20679–81 (Amentum ENs).  Offerors were permitted to make changes "to the[ir] original Cost/Price Factor" proposal.  AR 20676.

On or about June 2, 2022, the Army issued the first-round answers to offeror questions regarding the discussions process ("Q&As").  AR 20540–628.  Question number four asked: "Will the Government please confirm that in accordance with FAR 15.306 combined with Solicitation Section M.4.4 provisions, only Step-2 technically acceptable offerors were included in the competitive range and these Discussions?"  AR 20616.  The Army responded in the negative: "The Government is evaluating everyone that was evaluated for technical whether or not it was determined acceptable or unacceptable." AR 20616.  In that regard, the Q&A document specifically informed offerors that "[i]t's possible [that an] offeror did not move on to step 2 or 3 and therefore parts of the proposal may not have been evaluated."  AR 20616 (Answer to Question No. 19).  The Army contemplated requesting final provision revisions ("FPRs") prior to the close of discussions.  AR 20616 (Answer to Question No. 11).

While the Q&A document set a deadline of June 8, 2022, for revised proposals, AR 20616 (Answer to Question No. 7), the Army's transmittal email specified the deadline as June 17, 2022.  *See, e.g.*, AR 20624–25.  A second, subsequent Q&A document transmitted to offerors on or about June 8, 2022, *see, e.g.*, AR 20629, clarified that EN revisions would be due "COB 24 June 2022" with FPRs "due at a later date not yet identified."  AR 20630 (Q&A Round 2).  On June 21, 2022, the Army issued a third Q&A document.  AR 20642– 66.  The Army maintained the previous deadline for EN revisions and set a deadline for FPRs, instructing as follows: "EN revisions are due by COB 24 June 2022" and "[f]inal

proposal revisions are due by COB 22 July 2022." AR 20642. The offerors responded to ENs and submitted revised proposals. AR 20691–24210.

On August 3, 2022, the Army notified offerors "that the Government is closing discussions and requesting" FPRs. AR 24237 (Amentum Close Discussion Letter); *see also* AR 24245 (Vanquish Close Discussion Letter). The Army notified Amentum that it did not have to submit a revised technical proposal because "[t]he Government considers the Technical ENs resolved in full." AR 24237; *see also* AR 24221 (Amentum EN Responses Assessment) ("EVALUATOR ASSESSMENT OF OFFEROR RESPONSE: Updates have been verified and EN response is acceptable."). The Army set the new date for FPRs as Monday, August 15, 2022. AR 24237.

On August 12, 2022, however, the Army notified offerors that the Army is "aware that there are issues remaining that will require clarification" and thus, "[t]he due date for [FPRs] is being extended and will no longer be due on 15 August 2022," with a "revised proposal submission date [to] be provided at a later time." AR 24878 (Email to Contractors Regarding Updated FPR Date). On September 1, 2022, the Army received the offerors' FPRs. *See* ECF No. 26 at 6 ("FPRs were not due at the filing of this protest, but were since received [by the Army] on September 1, 2022."); ECF No. 34 at 66 (government confirming that FRPs "have been submitted" to the Army).

### D. Vanquish's Agency Protests

During the above-described discussions process, on May 23, 2022 — well in advance of the due date for EN responses, proposal updates, or FPRs — Vanquish filed a timely pre-award protest with the Army. AR 24250. Vanquish asserted that "if the Army has conducted discussions with offerors whose proposals were [originally] not determined to be technically acceptable, then the Army has violated the terms of the Solicitation." AR 24251. Vanquish further argued that "[w]hile the Army has the discretion to conduct corrective action, it does not have the discretion to deviate from the terms of the Solicitation." AR 24251.

On June 10, 2022, Vanquish filed yet another agency-level protest, AR 24384, "[t]he purpose [of which] is to ensure that the Army's corrective action is consistent" with the JSR filed in Amentum's earlier protest before this Court, AR 24385 ("Recent communications from the Army demonstrate that it is engaging in corrective action that is different than the corrective action described in the JSR."). More specifically, based on the Army's June 2, 2022, Q&A document, Vanquish asserted that "[t]he Army's response to Question 4 confirms that the Army is engaged in discussions with offerors whose proposals were determined to be technically unacceptable." AR 24393. Vanquish contended that including such offerors in the discussions process "violates Section M[.]4.4.2 of the Solicitation." AR 24393.

On June 22, 2022, while the first two-agency level protests pending before the Army, Vanquish filed a third, primarily reiterating variations on the arguments advanced in its first two agency-level protests.   AR 24514; AR 24521 ("[I]n establishing the competitive range and engaging in discussions with technically unacceptable offerors, the Army is violating the terms of the Solicitation and the requirements of the FAR.").

On July 25, 2022, the Army denied all three of Vanquish's protests.  AR 24834–46.[11] Undeterred, on July 28, 2022, Vanquish filed a request for reconsideration with the Army, AR 25062–81, which the Army summarily dismissed on August 25, 2022, AR 25082–83.

## II.    PROCEDURAL HISTORY

On August 10, 2022, Vanquish filed an action pursuant to 28 U.S.C. § 1491(b)(1), "challeng[ing] the Army's implementation of corrective action."  ECF No. 1 ("Compl.") ¶¶ 1, 7.   Vanquish asserts that "[b]ut for the Army's unlawful and arbitrary and capricious conduct in the corrective action, Vanquish would be selected for award of the contract, and is therefore an interested party with standing to bring an action under 28 U.S.C. § 1491(b)(1)."  Compl. ¶ 9.  Vanquish's complaint before this Court asserts two counts with the same central theme: the Army improperly established a competitive range and conducted "discussions with technically unacceptable offerors," Compl. ¶ 53, including Amentum, in violation of both FAR 15.306, Compl. ¶¶ 49–55 (Count I), and the Solicitation, Compl. ¶¶ 56–63 (Count II).  Vanquish's complaint requested a preliminary injunction and asserts that Vanquish is entitled to declaratory relief and a "permanent injunction, requiring the Army to follow the FAR, the DFARS, and all of the terms of its own Solicitation including the terms relating to the formation of a competitive range and discussions with offerors."  Compl. at 16 ("Prayer for Relief").

On August 15, 2022, Amentum filed a motion to intervene, ECF No. 8, which the Court granted, EFC No. 10.  That same day, the Court issued a status report order that memorialized the government's voluntary stay of the procurement to avoid the need for the parties to litigate, and the Court to decide, Vanquish's request for a preliminary injunction.  ECF No. 11.  On August 26, 2022, the government filed the administrative record, ECF No. 21, which was subsequently amended on September 8, 2022, ECF No. 24.

On September 12, 2022, the parties filed their respective motions for judgment on the administrative record ("MJAR").  *See* ECF No. 25 ("Pl. MJAR"); ECF No. 26; ECF No. 27 ("Intv. MJAR").  On September 21, 2022, the parties filed timely response briefs.  *See*

---

[11] Separate from Vanquish's protests, Amentum, on August 11, 2022, filed an agency-level protest with the Army, challenging an alleged "ambiguity that exists between the [S]olicitation . . . and conflicting statements from the Army regarding which versions of the relevant Collection Bargaining Agreements and Wage Determinations offerors should utilize."  AR 24849.  There is no evidence in the record that the Army has decided or otherwise resolved that protest.

ECF No. 30; ECF No. 31 ("Pl. Resp."); ECF No. 32.  On September 29, 2022, the Court held oral argument.  ECF No. 34 ("Tr.").

## III.    JURISDICTION AND STANDING

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1); *see also Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[12]

"Standing is an integral part of jurisdiction."  *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 14 (2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "The party invoking federal jurisdiction bears the burden of establishing standing." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)).  "Where a plaintiff lacks standing, its case must be dismissed pursuant to RCFC 12(b)(1)."  *Aero Spray, Inc.*, 156 Fed. Cl. at 556 (citing *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003)).

To establish standing in a § 1491(b) action, a plaintiff must demonstrate that it is an "interested party."  *Id.* at 559 ("[T]he Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them.").  In a post-award protest action, an "interested party" is "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).  In a pre-award protest action — typically involving a challenge to the terms of a solicitation — a plaintiff must allege facts that "demonstrate[] a 'non-trivial competitive injury which can be addressed by judicial relief.'"  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352,

---

[12] *Cf. Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 96–97 (2020) ("[A]lthough '[the Administrative Dispute Resolution Act] covers *primarily* pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (third alteration in original) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999))).

1362 (Fed. Cir. 2009) (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)).[13]

Under either "interested party" test, "the question of prejudice goes directly to the question of standing," and thus "the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). Also, under either test, a plaintiff must allege *facts* — not mere conclusory assertions of law — demonstrating prejudice. *See Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 89 (2021) ("[T]he court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors." (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996))). The Court assumes the *facts* alleged in a plaintiff's complaint are true for the purposes of evaluating standing but not for the purpose of resolving whether a plaintiff has demonstrated prejudice on the merits. *See id.* at 89 ("For the limited purpose of determining whether it has standing, a protestor's allegations are assumed to be true." (citing *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019))); *Am. Relocation Connections*, 789 F. App'x at 226 ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions."); *Yang Enterprises, Inc. v. United States*, 156 Fed. Cl. 435, 444 (2021) ("The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry.").[14]

Amentum, but not the government, challenges Vanquish's standing on the grounds that Vanquish has failed to allege facts demonstrating prejudice. *See* Intv. MJAR at 14–16. In any event, the Court has an independent duty to ascertain whether it possesses jurisdiction to decide Vanquish's claims and whether it has standing to pursue them. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))); *see also* RCFC 12(h)(3).

---

[13] *Aero Spray, Inc.*, 156 Fed. Cl. at 562 (explaining that "[t]he Federal Circuit . . . modified that post-award standing test for pre-award cases" because "applying the [post-award] 'substantial chance' test makes little or even no sense" where "an agency is in the early stages of the procurement process and potential offerors have not even submitted proposals yet").

[14] To succeed on the merits, a plaintiff must prove its allegations. *See L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 289 (2011) ("[T]he prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true.").

16

Having considered Amentum's arguments and Vanquish's complaint, the Court concludes that Vanquish, by a hair, has alleged sufficient facts for a narrow ground of protest.[15]

Vanquish's allegations of prejudice are limited to a single paragraph in its complaint under a section entitled "Jurisdiction and Standing":

> [1] The Army previously awarded a contract to Vanquish under this procurement prior to its current corrective action. [2] Vanquish should not be forced to compete in a procurement where an agency's corrective action is unlawful and violates the Solicitation. [3] But for the Army's unlawful and arbitrary and capricious conduct in the corrective action, Vanquish would be selected for award of the contract, and is therefore an interested party with standing to bring an action under 28 U.S.C. § 1491(b)(1)[.]

Compl. ¶ 9. The first sentence in that paragraph is true and undisputed. The Court reads the second sentence *very generously* as asserting a harm from having to compete for a contract twice in violation of the Solicitation. *Cf. Seventh Dimension, LLC*, 160 Fed. Cl. at 35 ("[P]laintiff should not be made, quite unfairly, to compete twice for a procurement it has all but won already . . . ."). As to that assertion, the Court agrees that Vanquish adequately alleges prejudice pursuant to the pre-award "interested party" test, which the Court assumes, but does not definitively determine, applies here.[16]

As to the third sentence of that above-quoted paragraph, however, Vanquish alleges zero *facts* demonstrating that "[b]ut for the Army's unlawful . . . conduct[,] . . . Vanquish would be selected for award of the contract." Compl. ¶ 9. Conclusory assertions of prejudice are not entitled to any weight, even at this stage. *See Perry v. United States*, 149 Fed. Cl. 1, 33 (2020) ("[T]he complete lack of any *factual* allegations contained in [the] Complaint to support an illegal exaction claim precludes this Court from

---

[15] The fact that a plaintiff may "successfully allege[] an injury (or prejudice) for standing purposes" — because if the plaintiff "succeeded on the merits . . . it would have a 'greater than an insubstantial chance of securing the contract'" — does not excuse a plaintiff from proving prejudice on the merits based on the administrative record. *Am. Relocation Connections*, 789 F. App'x at 227 (quoting *Info. Tech.*, 316 F.3d at 1319).

[16] Vanquish, in its MJAR, argues that "the Army is forcing Vanquish to recompete for a contract on an unlevel playing field, where the ground rules have been changed." Pl. MJAR at 23. Vanquish, however, does not allege or prove facts demonstrating either (1) an unlevel playing field, or (2) that the ground rules have been changed. Nor does Vanquish establish how any such changes impact Vanquish negatively or unfairly.

exercising subject-matter jurisdiction."), *aff'd*, 2021 WL 2935075 (Fed. Cir. July 13, 2021).[17] Moreover, that allegation of prejudice cannot possibly be ripe because (1) FPRs already have been submitted, and (2) Vanquish may still win the contract award as a result of the ongoing procurement process. *See Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affs.*, 464 F.3d 1306, 1315–16 (Fed. Cir. 2006) ("It is appropriate for us to consider ripeness even though it is not raised by the parties because ripeness is a jurisdictional consideration that the court may address sua sponte."). Accordingly, the Court grants, in part, Amentum's motion to dismiss pursuant RCFC 12(b)(1), with regard to the second category of prejudice Vanquish asserts.

In any event, the Court rejects Vanquish's entire protest as meritless.

## IV.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review contained in the Administrative Procedure Act (APA) § 10(e), 5 U.S.C. § 706. *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). In particular, in accordance with the APA, this Court reviews an agency's procurement decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions." *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). In reviewing an agency's procurement decision, the Court "determine[s] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). A plaintiff succeeds on the merits where it demonstrates, based on a trial on the administrative record,[18] that either: "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id.* at 1332.

---

[17] The "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998). Of course, "mere legal conclusions employing the right words to create a putative jurisdictional hook are pretextual and cannot create jurisdiction where none exists." *Wickramaratna v. United States*, 2022 WL 1124872, at *5 (Fed. Cl. Apr. 15, 2022).

[18] *See Bannum*, 404 F.3d at 1354–56.

## V.    DISCUSSION

### A. Vanquish Is Bound by Its Prior Agreement with the Parties During Amentum's Bid Protest Action

Vanquish's challenge to the Army's conduct here boils down to the assertion that Vanquish "should not be forced to compete with Amentum and other offerors whose proposals are technically unacceptable and . . . could not properly be placed in to [sic] the competitive range under the Solicitation as published to all offerors more than two years ago." Pl. MJAR at 24.  But Vanquish should have thought about all of this before it signed-on to the JSR ultimately resulting in the dismissal of Amentum's protest.  Here is the bottom line up front: the government is doing exactly what the parties agreed to; Vanquish cannot now ask this Court to tell the government to reverse course.

As noted above, the parties, in response to Amentum's earlier protest, jointly represented to the Court as follows:

> The [Army] has decided to rescind the disputed contract award to Vanquish, establish a competitive range, engage in discussions, and accept proposal revisions. *The agency's decision renders Amentum's protest moot.* The parties intend to file a joint stipulation of dismissal without prejudice with each party to bear its own costs and fees.

Joint Status Report at 1, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 30 (emphasis added).

Given that the parties agreed that Army's corrective action would "render[] Amentum's protest moot," *id.*, and that Amentum's complaint challenged not only the Army's general failure to conduct discussions but also the Army's technical evaluation of Amentum's proposal, Amended Complaint ¶¶ 121–132, *Amentum Servs., Inc.*, 2021 WL 5871734 (No. 21-2029C), ECF No. 21, the Court's ineluctable conclusion is that the parties must have agreed that Amentum would be included in the resulting discussions.

An easy counterfactual demonstrates the Court's reasoning is correct.  Imagine if the Army's corrective action did *not* include permitting Amentum to revise its proposal in a FPR via discussions.  According to Vanquish, Amentum agreed to a process that cured nothing but rather left Amentum ineligible for award.[19]   The absurdity of

---

[19] *See* Tr. 5:13–22 (Vanquish counsel agreeing that this Court should "read the joint status report" as requiring the government to "establish a competitive range that excludes Amentum"); Tr. 9:14–18 ("THE COURT: Wait.  You want me to read [the JSR as] Amentum['s] agreeing to a joint status report that said the Government is going to go back [to conduct discussions] but exclude

Vanquish's position is striking: Amentum gained literally nothing by agreeing to corrective action in the JSR and the subsequent joint stipulation of dismissal. More significantly still, such an interpretation would mean that the corrective action did *not* moot Amentum's protest — as it sought to challenge its technical rating even in the absence of discussions. But we *know* that all the parties, and this Court, previously agreed that the agreed-upon corrective action *did* render Amentum's complaint moot.[20] Another way to think about the absurdity is this: were Amentum excluded from the competitive range (and hence discussions) during corrective action, we would be right back where we started — having to resolve Amentum's complaint. Vanquish may now regret having agreed to the rescission of its award and to the reopening of the competition, but that is all water under the bridge.

In the absence of a time machine, Vanquish is out of luck; Vanquish is bound by its agreement with the government and Amentum. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (alteration in original) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)); *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed."); *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496, 501 (6th Cir. 2010) (finding that the plaintiff-appellant "waived its right to pursue [an] issue on appeal" where a joint motion contained language that was "a clear and unequivocal waiver of [the plaintiff-appellant]'s right to further pursue its motion to remand on appeal, and [the plaintiff-appellant] neither contest[ed] the validity of the [j]oint [m]otion nor suggest[ed] an alternative reading of th[e] clause"); *Damato v. Sullivan*, 945 F.2d 982, 987 n.3 (7th Cir. 1991) ("[S]ince the [Defendant] acquiesced in the magistrate's recommendation for remand, the issue of whether it was within the district court's authority to remand the case is not before us."); *Out of Line Sports, Inc. v. Rollerblade, Inc.*, 213 F.3d 500, 502–03 (10th Cir. 2000) (joint motion to release funds to satisfy judgment moots appeal of that judgment); *Reeves v. Nicholson*, 21 Vet. App. 66 (2006) ("[T]he appellant's opening brief fails to acknowledge the prior joint motion for remand, much less make an argument that there is a reason that it should not be considered binding as to the facts agreed upon by the parties."); *Massicci v. Peake*,

---

Amentum? [VANQUISH COUNSEL]: Well, they did agree to that . . . ."); Tr. 12:18–21 (Vanquish counsel arguing that the JSR should be read as "establish[ing] a competitive range that follows the solicitation, and the effect of that is to exclude Amentum").

[20] Indeed, Vanquish agreed with the Court during oral argument that, under Vanquish's strained interpretation of the corrective action described in the JSR, only the discussions issue involving DFARS 215.306 would have been solved "but not the other count" regarding Amentum's technical acceptability. Tr. 20:13–25.

2008 WL 4963401, at *3 (Vet. App. Mar. 17, 2008) (noting that "the parties' joint motion for a remand . . . represent[s] an agreement by the parties" such that the appellant, "who was represented by counsel in crafting the agreement, cannot now disavow the agreement for which he bargained").

Vanquish, to support its strained interpretation of the parties' agreement (as reflected in the January 24, 2022, JSR at issue), points to email communications among the parties that predate the filing of that JSR.  AR 24926–69.  In particular, Vanquish relies upon draft JSR language that Amentum proposed that would have expressly committed the government to including Amentum in the competitive range for discussions.  Pl. MJAR at 8 (citing AR 24933–37); Pl. Resp. at 11 (citing AR 24935).  Counsel of record for the government ultimately rejected Amentum's proposed language; the Court knows this because the next draft lacks Amentum's language.  AR 24938–46.  That said, the government responded to Amentum's proposed language only in a private email to Amentum's counsel, and thus Vanquish could not have relied upon it (even assuming there was some clear inference that could be drawn from that email).  *See* AR 24938.

Thereafter, Amentum suggested yet further revisions, AR 24941–46, which the government accepted, AR 24947, and Vanquish approved as well, AR 24956 ("This revised version is agreeable to the intervenor.").  This Court, however, cannot, by negative implication, infer from the government's rejection of Amentum's proposed language that somehow the parties all understood and agreed that Amentum would *not* be included in the competitive range.  Such a speculative conclusion is not justified.  For all the Court knows, the government simply preferred brevity in the JSR — a worthy goal the undersigned admittedly often fails to meet.

More significantly, the administrative record all but demonstrates that Vanquish's position is nothing more than a creative *post hoc* interpretation crafted by counsel in the heat of litigation and never reflected Vanquish's actual, contemporaneous view of the corrective action when the parties first discussed it.  In that regard, Vanquish reviewed the government's initial draft JSR, which contained a description of the putative corrective action that was even more terse that what the parties ultimately adopted.  AR 24927–31.  Vanquish responded to the government's proposed JSR in an email that conclusively shows that Vanquish understood that the Army intended to do precisely what Vanquish now challenges:

> We assume the agency's corrective action will extend to Vanquish and will allow for Vanquish to submit a revised proposal.  Please confirm that.  *We also assume the agency's discussion will include Amentum and that Amentum also will be permitted to submit a revised proposal*.  Will any other offerors be included in the agency's proposed corrective action?  If so,

> will that be limited only to those that were in the competitive
> range?  Please let us know.

AR 24931 (emphasis added).  Indeed, the only real question Vanquish had was whether
"any other offerors [would] be included in the agency's proposed corrective action."  AR
24931.  Accordingly, Vanquish understood quite well that Amentum's prior protest could
only be rendered moot by including Amentum in the corrective action.  Vanquish could
have made its position clear (or opposed the corrective action) but failed to do so.[21]

Permitting Vanquish to unravel its previous agreement with the parties (which
resolved Amentum's protest) would be remarkably prejudicial to both the government
and Amentum for obvious reasons.  Not the least of these reasons are (1) the passage of
time and the government's need to complete this procurement, (2) the government's and
the other offerors' investments in the discussions process and the creation and
submission of their respective FPRs, and (3) the fact that accepting Vanquish's position
here would mean all the parties are back to square one regarding Amentum's protest
action that the parties previously resolved (with the Court's approval).

### B. The Government Did Not Violate FAR 15.306 or the Terms of the Solicitation

In addition, the Court holds the government's implementation of corrective action
is consistent with the FAR and the Solicitation.  FAR 15.306(c) governs the formation of
the competitive range prior to conducting discussions and does not prohibit the
government from engaging in discussions with technically unacceptable offerors, as this
Court previously has explained:

> [T]he entire point of discussions is to permit offerors "[a]t a
> minimum" to address "deficiencies" and "significant
> weaknesses" (amongst other information not relevant here).
> FAR 15.306(d)(3); *see also Aviation Ground Equip. Corp.*,
> B-417711.2, 2021 CPD ¶ 183, 2021 WL 2109102, at *8 (Comp.
> Gen. May 3, 2021) ("The FAR makes clear one of the purposes
> of discussions is to address deficiencies and significant
> weaknesses in proposals." (citing FAR 15.306(d)(3))).  The
> FAR further "encourage[s]" the contracting officer "to discuss
> other aspects of the offeror's proposal that could, in the
> opinion of the contracting officer, be altered or explained to
> enhance materially the proposal's potential for award."  FAR

---

[21] During oral argument, the Court pointed out that, according to Vanquish's argument here,
Vanquish in its contemporaneous correspondence with the government should have said "by the
way, Amentum should *not* be included."  Tr. 31:2–3.  Counsel for Vanquish weakly responded
only that "I wish we had."  Tr. 31:4.

> 15.306(d)(3).  Thus, the FAR expressly distinguishes between, on the one hand, "deficiencies" and "significant weaknesses" — both of which "the contracting officer *must . . .* discuss" with offerors — and, on the other hand, "other aspects" of a proposal that *may* potentially impact the chance for award.  *Id.* (emphasis added).

*IAP Worldwide Servs., Inc.*, 159 Fed. Cl. at 311 (second and third alterations in original).

Accordingly, "the government has the discretion to include even technically unacceptable proposals in the competitive range."  *Id.* at 318 (citing *Aviation Ground Equip.*, 2021 WL 2109102, at *8 ("[T]he determination whether a proposal should be included [in the competitive range] is principally a matter within the sound judgment of the procuring agency. While exclusion of technically unacceptable proposals is permissible, it is not required." (citations omitted)); *see also Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 996 (Fed. Cir. 2018) (explaining that offerors "deemed unacceptable" may improve their competitive position via discussions); *Info. Tech.*, 316 F.3d at 1319 (holding that, to establish prejudice, a plaintiff must only demonstrate that its "chance of securing the award must not have been insubstantial," and that a plaintiff demonstrates prejudice where the agency "improperly failed to conduct 'discussions' . . . [and] if it had, [the plaintiff] would have been able to cure deficiencies in its bid").

Moreover, even putting aside the parties' agreement resolving Amentum's protest, the Solicitation does not preclude the government's including Amentum in the competitive range.  To the contrary, the Solicitation contemplated discussions as part of Step 1 of the evaluation process.  *See* AR 173 (RFP § M.4.1).  Indeed, as part of Step 1, the Solicitation provides that "the Government reserves the right to conduct discussions [in accordance with] [§] M.4.4 . . . if the Contracting Officer determines that discussions would be advantageous to the Government."  AR 173 (describing "STEP 1: Technical Factor Evaluations").  In turn, nothing in Section M.4.4 requires the government to eliminate Amentum from the competitive range or requires the government to limit the competitive range only to technically acceptable proposals.  In that regard, Section M.4.4.1 provides that "[o]nly Offerors determined Technically Acceptable will remain in [a] *subsequent* competitive range and proceed to [Step 2]."  AR 173 (emphasis added).  That provision necessarily implies that there is an earlier competitive range determination for the purposes of discussions *within Step 1*.

Vanquish has an entirely different reading of the Solicitation.  According to Vanquish, Section M.4.4.1's references to "discussions" and a "subsequent competitive range determination" are not being used as those terms of art are defined in the FAR but rather simply refer to the agency's down-select process from Step 1 to Step 2.  Pl. MJAR at 15–16; Tr. 36:17–22.  Thus, Vanquish contends that discussions may only take place as part of Step 2.  Pl. MJAR at 2, 5, 16.  But the Court cannot ignore the plain meaning of

23

those terms of art, particularly given the RFP's reference to discussions in Step 1 (RFP § M.4.1), and to FAR 15.306 in Section M.4.4.1.  *See* AR 173.  Also, if the Solicitation really contemplated discussions only as part of Step 2, as Vanquish contends, then Section M.4.4.1 would be rendered superfluous because Section M.4.4.2 itself addresses Step 2 discussions.  This Court should ordinarily read solicitations as a whole to avoid rendering some provisions meaningless.  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.").  In any event, the Solicitation expressly provided the government with the flexibility to dispense entirely with the two-step down-select process.  *See* AR 174 (RFP § M.4.1.f) ("The Government reserves the right to simultaneously evaluate Technical, Past Performance (if applicable), Small Business Participation (if applicable), and Cost/Price proposals.").[22] Because the government could disregard the multi-step evaluation process, there is no necessary distinction between Step 1 and Step 2, and the government was free to form a competitive range and conduct discussions at any point during the evaluation process.

## VI.   CONCLUSION

For the above reasons, the Court **DENIES** Plaintiff's motion for judgment on the administrative record and **GRANTS** Defendant's and Defendant-Intervenor's respective motions for judgment on the administrative record.  Accordingly, the Clerk of the Court is directed to enter **JUDGMENT** for Defendant and Defendant-Intervenor, terminating this case.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge

---

[22] Vanquish conceded this point during oral argument.  *See* Tr. 10:22–24 ("[T]here's a reserved right in the RFP that the Government can review all of the evaluation factors at the same time.").